

**NUMBER 13-07-00541-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

## IN THE INTEREST OF C.C., D.W., JR., AND A.W., CHILDREN

---

## On appeal from the 267th District Court of DeWitt County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Benavides
### Memorandum Opinion by Justice Benavides

This is an appeal from a final order terminating the parental rights of Lucy,[1] the mother of C.C., D.W., Jr., and A.W.[2] By five issues, Lucy challenges the termination order, arguing that: (1) the evidence was factually insufficient to support a finding that termination was in the children's best interest; (2) the trial court erred by terminating her parental rights based upon her drug use; (3) the Texas Department of Family and Protective Services (the

---

[1] To protect the mother's and children's privacy, we refer to the mother as Lucy, a fictitious name, and the children by their initials. *See* TEX. FAM.CODE ANN. § 109.002(d) (Vernon 2008); TEX. R. APP. P. 9.8(b)(2).

[2] At the time of trial, C.C. was eleven years old, D.W., Jr., was eight years old, and A.W. was eighteen months old.

"Department") "jumped the gun" in seeking termination; (4) the trial court erroneously conditioned her ability to see her children on a "clean" drug test prior to each visit; and (5) the trial court erroneously terminated her parental rights based on her lack of contact with the children while in the Department's custody because she was judicially prevented from visiting the children. We affirm.

## I. BACKGROUND

### A. Procedural History

On February 15, 2006, Lucy was pregnant with A.W. and went to a hospital to deliver the baby. The Department received a referral for services on February 16, 2006, because Lucy tested positive for cocaine and marijuana when she gave birth to A.W. The Department took possession of C.C., D.W., Jr., and A.W. on February 23, 2006.[3] On February 24, 2006, it filed an "Original Petition for Protection of a Child," seeking appointment as the children's conservator and to terminate Lucy's parental rights.[4]

On February 24, 2006,[5] the trial court issued temporary orders appointing the Department as temporary managing conservator of the children. This order was extended through March 14, 2006, at which time the court held a full adversarial hearing. After that hearing, the trial court again issued a temporary order appointing the Department as temporary managing conservator of the children. The court appointed Lucy as temporary

---

[3] *See* TEX. FAM. CODE ANN. § 262.104 (Vernon 2008) (providing for emergency removal of children by the Department).

[4] *See id.* § 262.105 (Vernon 2008).

[5] The order states that the original petition was presented to the court on February 23, and the trial court also signed and dated the order as February 23. However, the petition and affidavit were signed and filed on February 24, and the order was filed on February 24. We believe that the February 23 date was a typographical error, of which the parties do not complain.

2

possessory conservator and limited Lucy to supervised visitation every other week for two hours. The court also allowed Lucy to call the children once a week on visitation weeks and two times a week on non-visitation weeks. The order stated that, in order to obtain the return of her children, Lucy would be required to: (1) submit to a psychological or psychiatric examination; (2) attend counseling; (3) attend parenting classes; (4) participate in drug and alcohol assessments and testing; (5) comply with a service plan created by the Department; and (6) provide required information to the court.

On April 6, 2006, the Department prepared, and Lucy signed, a service plan setting forth the actions required of Lucy to reunite with her children.[6] In accordance with the trial court's order, the plan required Lucy to attend parenting classes, attend counseling sessions, attend homemaking classes, submit to a psychological evaluation, submit to a drug and alcohol assessment and follow the provider's recommendations, participate in a drug and alcohol recovery program and follow the guidelines and procedures of the program, submit to drug testing, and maintain a positive level of cooperation with the Department.[7] On April 12, 2006, the trial court approved the service plan and adopted it as an order.[8]

---

[6] *See id.* § 263.101 (Vernon 2008) ("Not later than the 45th day after the date the court renders a temporary order appointing the department as temporary managing conservator of a child under Chapter 262, the department or other agency appointed as the managing conservator of a child shall file a service plan.").

[7] *See id.* § 263.102 (Vernon 2008) (setting out requirements for service plan).

[8] *See id.* §§ 263.105, 263.201 (Vernon 2008) (stating court shall hold a hearing to review the service plan); *id.* § 263.202 (Vernon 2008) (requiring court to review service plan's accuracy, reasonableness, and compliance with court orders).

At a status hearing on July 6, 2006, the court found that Lucy had not demonstrated adequate compliance with the service plan.[9] It ordered that Lucy submit to drug tests before any scheduled visitation with the children and that the visitation not occur if Lucy tested positive for drugs.[10]

The court initially scheduled trial for February 8, 2007 and set a dismissal date for February 26, 2007.[11] However, on February 8, 2007, the Department requested that the court retain the case on its docket for a period of not more than 180 days.[12] The court granted the motion and retained the case on its docket.

## B. The Evidence at the Final Termination Hearing

After several more status hearings, the trial court held a final termination hearing on July 18, 2007. The termination issue was tried to the court. The Department offered the testimony of several of its caseworkers. Tiffany Graham testified that she conducted the initial investigation.[13] Crystal Laslie served as Lucy's caseworker from July 2006 through March 1, 2007. Lisa Wright was Lucy's caseworker from March 1, 2007 until the termination hearing on July 18, 2007. Diana Hoover, Lucy's counselor, also testified, as

---

[9] See id. § 263.202(c) (requiring court to inform the parties that compliance with the service plan will be reviewed at status hearings).

[10] See id. § 263.106 (Vernon 2008) ("The court may render appropriate orders to implement or require compliance with an original or amended service plan.").

[11] See id. § 263.401(a) (Vernon 2008) ("Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.").

[12] See id. § 263.401(b) (allowing a trial court to retain case on its docket for an additional 180 days if extraordinary circumstances exist).

[13] Thereafter, Cassie Bohac became Lucy's caseworker and served in that capacity from March 2006 to July 2006. Bohac did not testify at trial.

4

did Lucy herself.  The following facts are derived from these witnesses' testimony.

**1.    Initial Investigation**

First, Graham testified that on February 16, 2006, the Department received a referral after Lucy went to the hospital to deliver A.W.  At the time of the delivery, Lucy was in a "severe emergency situation" because she had high blood pressure.  Lucy tested positive for cocaine and marijuana.

Graham testified A.W. was born with a low birth weight of four pounds, 2.6 ounces.  An initial urine test conducted on A.W. was negative for the presence of drugs.  Laslie testified that later, a meconium[14] test showed that A.W. was positive for both cocaine and marijuana.  Graham testified, however, that other than a low birth weight, A.W. was a healthy baby who appeared to have no effects from Lucy's drug use.

Lucy remained in the hospital's intensive care unit for five days, and Graham visited her in the hospital after she was moved from the unit.  Graham confronted Lucy about her drug use.  At the time, Lucy admitted that she had purchased marijuana cigarettes prior to delivering A.W.  At trial, Lucy explained that she had been nauseous during her pregnancy and that she purchased marijuana on February 14, 2006, the day before A.W. was born.  Lucy claimed that she had not intentionally used cocaine and speculated that the marijuana cigarettes had been laced with cocaine without her knowledge.  Lucy later admitted that she had purchased and used cocaine in October 2005, while pregnant with A.W.  At trial, Lucy claimed that her drug use in October 2005 occurred before she became aware that she was pregnant.

---

[14] Meconium" is the medical term for a newborn infant's first stools.  *See* MedlinePlus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/002262.htm (last visited Mar. 12, 2009).

Graham stated that on February 19, 2006, during Lucy's hospital stay, the hospital's nursing department reported that Lucy went outside of the hospital and visited with some people in a vehicle. When Lucy returned to her hospital room, her blood pressure was "significantly elevated." The nurses became concerned and asked for a urine screen. Lucy tested positive for cocaine at that time. Graham stated that a nurse opined that Lucy had used cocaine in the parking lot, which would explain the sudden rise in Lucy's blood pressure.

On the contrary, Lucy testified that she visited with a friend, and they sat in a car and smoked cigarettes. She denied using cocaine in the hospital parking lot. She acknowledged, however, that any cocaine use on February 14, 2006 would not have caused the positive drug test on February 19, 2006. She claimed that she was "set up" somehow.

Graham stated that the Department had investigated Lucy in October 2005. Lucy testified that at that time, she and the children were living in Cuero, Texas, with E.W., who is A.W.'s father. The allegations in that investigation were that Lucy and E.W. were using drugs in the home on a daily basis. The referral also stated that Lucy and E.W. were smoking marijuana around C.C. and D.W., Jr.

Graham related that during the prior investigation, Joshua Miles, a caseworker, visited the family at 10:30 in the morning on one particular occasion, and found E.W. to be intoxicated. Miles observed a marijuana cigarette in an ashtray and one on the floor. Furthermore, Miles determined that E.W. had struck D.W., Jr., on a prior occasion, causing him to bleed. Lucy denied that E.W. ever abused D.W., Jr., or C.C.

Graham spoke with C.C. during her investigation. She testified that C.C. was aware

6

that his mother smoked marijuana, but he believed that she had stopped.  At trial, Lucy testified that she "may have" used drugs in her children's presence, and she stated that the children "know what [drugs] are."  She then clarified that C.C. and D.W., Jr., had seen her smoke marijuana.  She denied, however, that she had ever used cocaine around her children or been under its influence in their presence.

Graham admitted that during the 2005 investigation, Miles visited C.C. and D.W., Jr., at school, and both children were dressed in clean, appropriate clothes and did not appear to have any marks or bruises.  Miles also talked to a local police officer, a neighbor, a principal, and a school counselor, who all indicated they had not seen any evidence of physical abuse and had no concerns about the family.

### 2.    Lucy's Conduct from March 2006 through June 2006

Laslie testified that after Graham conducted the initial investigation, the Department created a family service plan for Lucy, which Lucy signed.   Laslie testified that the Department's main concern was Lucy's alleged drug use.  Lucy completed a drug and alcohol assessment by Mid-Coast Family Services ("Mid-Coast") in early March 2006. Mid-Coast determined that Lucy had a problem with marijuana, but that Lucy denied any and all cocaine usage during the assessment.  The assessment noted that Lucy was not cooperative and recommended that she continue with the Department's proposed services, including random drug testing.

Laslie also testified that Lucy completed her psychological evaluation in March 2006 and that the psychologist felt it was critical that Lucy address her chemical dependency problem.  Lucy worked with homemaker services from April to June 2006, and she received a certificate of completion.  Lucy also completed a parenting class, as required

7

by the service plan.

In the spring of 2006, Lucy also attended three sessions with Hoover, a licensed professional counselor. Hoover stated that in March of 2006, Lucy acknowledged that she had a substance abuse problem. Hoover stated that they "didn't seem to be getting very far," and Lucy stopped attending counseling after three sessions.

### 3. Lucy's Conduct from July 2006 through February 2007

Laslie explained that on July 6, 2006, the trial court issued an order that required Lucy to submit to a drug test before every scheduled visit with the children and that precluded her from seeing the children if she failed the test. Laslie stated that, for the most part, Lucy complied with the random drug testing. She testified that on August 14, 2006, however, Lucy refused a drug test, stating that she had taken some prescription drugs that were not prescribed to her. In addition, on several other occasions, Lucy was not home when Laslie attempted to drug test her.

Laslie said that she performed nine drug tests during her service as Lucy's caseworker, five of which were positive for drugs:

- on July 14, 2006, Lucy tested negative for drugs;

- on July 24, 2006, Lucy tested positive for marijuana;

- on July 31, 2006, Lucy tested positive for marijuana and cocaine;

- on October 26, 2006, Lucy tested positive for marijuana and cocaine;

- on December 7, 2006, Lucy tested positive for cocaine;

- on December 14, 2006, the results were unavailable;

- on January 17, 2007, Lucy tested negative for drugs;

- on February 5, 2007, Lucy tested negative for drugs; and

8

•       on February 28, 2007, Lucy tested positive for marijuana.

Laslie stated that in October of 2006, another drug and alcohol assessment was performed. Lucy again denied using cocaine on a regular basis. Laslie testified that, based on Lucy's failure to be candid with Mid-Coast, it recommended that Lucy complete an outpatient drug treatment program. Laslie gave Lucy contact numbers for several rehabilitation clinics. However, Lucy never successfully completed an outpatient treatment program. Laslie stated that, on numerous occasions, she informed Lucy that in order for her to be reunited with her children, Lucy had to provide the Department with information that she was going to be "clean and sober" and able to provide a safe, adequate, and drug-free home.

Laslie stated that Lucy visited her children on either July 18 or 19, 2006. However, because of her failed drug tests, Lucy did not see the children again until December 2006. In December 2006, Lucy went to Perpetual Help Home, which is a home for recovering drug abusers. Lucy attended Alcoholics Anonymous ("A.A.") and Narcotics Anonymous ("N.A.") meetings while residing at Perpetual Help Home. Laslie testified that at that time, Lucy was in therapy and began testing negative for drugs. Lucy was also employed at Burger King. Laslie testified at trial that as of December 2006, she believed that Lucy was complying with the service plan. At that time, Laslie recommended reunification with the children. At a hearing on February 8, 2007, Laslie informed the trial court that Lucy was complying with the service plan.

Lucy, however, did not stay at Perpetual Help Home, and she began testing positive for drugs. Laslie testified that in February of 2007, the Perpetual Help Home staff had concerns about Lucy's attitude, and Lucy chose to leave and return to Cuero, her home

9

town. There, she was employed at Whataburger and was residing with a relative. As noted above, on February 28, 2007, Lucy tested positive for marijuana.

Laslie observed Lucy's visits with her children, and she opined that Lucy had a bond with C.C. and with D.W., Jr. Both C.C. and D.W., Jr., told Laslie that they looked forward to visits with their mother. They often asked about Lucy and when they would be able to see her. Laslie testified that the children were "saddened" when they were unable to visit Lucy. Laslie stated that C.C. expressed a desire to return to live with Lucy. He was excited when Lucy was complying with the service plan and believed he could go home. Laslie also stated that when she observed Lucy with A.W., Lucy would take care of the child and "do things that a mother would do with the child." She also stated that Lucy would bring gifts for the children, such as food that the children had requested.

## 4. Lucy's conduct from March 2007 through July 2007

Wright testified that while she served as Lucy's caseworker, she conducted random drug tests on Lucy. She stated that Lucy had four "dirty" drug tests and one "not dirty" test, as follows:

- on March 12, 2007, Lucy tested positive for cocaine;

- on March 19, 2007, Lucy tested negative for drugs;

- on April 3, 2007, Lucy tested positive for marijuana;

- on April 27, 2007, Lucy tested positive for marijuana; and

- on May 29, 2007, Lucy tested positive for marijuana.

Wright testified that although Lucy was entitled to visit her children twice a month

if she passed her drug tests, from February 2007[15] through the date of trial, Lucy only had three visits with her children because of her positive drug tests. Wright testified that Lucy visited the children on February 28, 2007, but did not explain why Lucy was allowed to visit given the positive drug test. On May 9, 2007, Lucy was allowed to visit the children even though a test taken on April 27, 2007, was positive for marijuana. Wright explained that a caseworker in Cuero performed the drug test but had a family emergency, and the test results were not available before the scheduled visit. The Department allowed the visit without having the test results, which ultimately came back positive for marijuana.

Wright testified that Lucy was also allowed to visit C.C. on June 6, 2007, even though she tested positive for marijuana, because it was C.C.'s birthday. Wright stated that C.C. was really looking forward to seeing Lucy. She explained that on a prior occasion, when Lucy was unable to visit due to a positive drug test, C.C. reacted so negatively that it caused his foster mother to ask to have C.C. moved. Wright said that the Department allowed Lucy to visit on C.C.'s birthday, despite the positive drug test, because "we just thought it would be really disappointing to [C.C.] and create a bunch of behaviors for him[,] and we thought it was in the best interest of the child to allow her that visit."

Wright stated that when she first became Lucy's caseworker, Lucy provided her with two slips of paper indicating she had attended two N.A. and A.A. meetings. Although Lucy told Wright she was continuing to attend N.A. and A.A. classes, Wright never received any written documentation of her attendance. Wright testified that during the time she served as Lucy's caseworker, Lucy did not provide any other evidence of steps she was taking to

---

[15] Wright testified that she was aware of the February 2007 visit because it occurred the day before she officially became Lucy's caseworker, and she attended the visitation.

address her substance abuse problem. Lucy, on the other hand, testified that she attended A.A. meetings when she could, but she acknowledged that she was not able to attend every week.

Wright opined that Lucy was not candid about her drug use, explaining that even in the face of positive drug tests, Lucy would deny that she used drugs and provide alternative explanations for how the drugs got into her system. Wright informed Lucy that because of her positive drug tests, the unification process had been stopped until Lucy could prove that she could provide a drug-free life for the children. Wright believed that even though Lucy understood the gravity of her situation, Lucy was unable to overcome her chemical dependency.

When asked about her drug use, Lucy testified that she had "slacked down" and that she had not "had that many cocaine uses." She admitted that she had a problem with marijuana, but she again stated that she had "slacked down" and was "stopping it." She acknowledged the importance of maintaining a drug-free environment for the children, but she claimed that if given another chance, she would prove that she could maintain a drug-free lifestyle. On cross-examination, she admitted that she last used marijuana on July 4, 2007, just two weeks before trial. Lucy stated that she had not used cocaine since March 2007.

Wright testified that at the time of trial, Lucy was residing with her aunt in Cuero. Wright stated that the home is suitable; however, because several other family members also reside there, it would not be very structured and would not be a favorable place for the children to reside. Lucy testified that at the time of trial, she was employed at a nursing home in Cuero and living with her aunt, her uncle, and their daughter. She claimed that

she was looking to find her own home. She believed that she could maintain steady employment and a place to live for her family.

Wright testified that she believed the children are adoptable. She did not believe, however, that all three could reside in the same home because D.W., Jr., had mental health issues. Specifically, D.W., Jr., had been diagnosed with bi-polar disorder, attention deficit hyperactivity disorder, oppositional defiance disorder, and an anxiety disorder. His behavior was aggressive.

Wright stated that, to her knowledge, Lucy was continuing to see a therapist. Hoover confirmed that in March of 2007, Lucy began attending counseling again. She testified that Lucy's attitude had changed significantly since the sessions she attended in 2006, and Lucy was more positive. Hoover stated, however, that from March 2007 to the time of the hearing, Lucy acknowledged that she periodically used drugs. Hoover testified that Lucy was aware that her continued use of drugs jeopardized her ability to get her kids back. Hoover opined that Lucy was making progress but needed further counseling. Hoover testified that it is not healthy for a child to witness drug use in the home, and it can affect their emotional well-being.

### 5. C.C.'s Testimony and CASA's Recommendation

C.C. testified in the court's chambers. C.C. testified that he had seen his mother use drugs before. Nevertheless, C.C. testified that he missed Lucy and that he has enjoyed his visits with her. He testified that he is living with a foster family and making good grades in school.

Nicole Law, a Court Appointed Special Advocate ("CASA"), testified that she had been appointed as a CASA advocate for the case on April 30, 2007. She testified that she

13

had read through the files in the case and had one visit with each of the children but had not visited with Lucy. CASA's recommendation was to terminate Lucy's parental rights because Lucy has continued her lifestyle of drug use.

## C.    The Termination Order

On July 18, 2007, the trial court terminated Lucy's parental rights to all three children, finding by clear and convincing evidence that Lucy

(1)    "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children";[16]

(2)    "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children";[17]

(3)    "constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the [Department] or an authorized agency for not less than six months and:

[(a)]    the Department or authorized agency has made reasonable efforts to return the children to the mother;

[(b)]    the mother has not regularly visited or maintained significant contact with the children; and

[(c)]    the mother has demonstrated an inability to provide the children with a safe environment";[18]

(4)    "failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's

---

[16] T EX. FAM. CODE ANN. § 161.001(1)(D) (Vernon 2008).

[17] See id. § 161.001(1)(E).

[18] See id. § 161.001(1)(N).

removal from the parent under Chapter 262 for the abuse or neglect of the children;"[19] and

(5)    "used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the children, and

      [(a)]    failed to complete a court-ordered substance abuse treatment program; or

      [(b)]    after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance."[20]

The court further found that termination was in the best interest of the children.[21]

Lucy filed a notice of appeal on August 27, 2007, and a notice of issues to be relied upon on appeal on September 6, 2007.[22] This appeal ensued.

## II. PARENTAL MISCONDUCT

To terminate parental rights, a court must make two findings based on clear and convincing evidence: (1) that the parent has committed one of the acts prohibited under Texas Family Code section 161.001(1); and (2) that termination of the parent's rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001 (Vernon 2008); *In re J.L*, 163 S.W.3d 79, 84 (Tex. 2005); *Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 790 (Tex. App.–Houston [1st Dist.] 2008, no pet.).

---

[19] *See id.* § 161.001(1)(O).

[20] *See id.* § 161.001(1)(P).

[21] *See id.* § 161.001(2).

[22] *See id.* § 263.405(b)(2) (Vernon 2008) (requiring party to file statement of points on appeal with the trial court not later than fifteen days after a final termination order). The Department also sought to terminate the parental rights of the children's fathers. The July 18, 2007 order terminated the parental rights of H.G. and E.W., the fathers of C.C. and A.W., respectively. However, it did not terminate the parental rights of B.S., who is D.W., Jr.'s father. The trial court severed the termination suit against B.S. on August 23, 2007, making the July 18 order final. Thus, the statement of points on appeal was timely. Neither H.G. nor E.W. have appealed the termination of their parental rights.

15

As described above, the trial court found five statutory grounds for termination. On appeal, however, Lucy challenges only three of the statutory grounds relied upon by the trial court to terminate her rights. Specifically, by her second issue, Lucy argues that the trial court erred in terminating her parental rights based on her drug use without evidence showing that the drug use injured the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(P). By her fourth and fifth issues, Lucy argues that the trial court erroneously conditioned her ability to visit her children while in the Department's custody upon a "clean" drug test because the condition was not in the children's best interest, and her parental rights should not have been terminated based on her failure to visit the children given that she was judicially prevented from visiting when she failed her drug tests. *See id.* § 161.001(1)(N). By her third issue, Lucy argues that the evidence does not support the trial court's finding that the Department made reasonable efforts to return the children to her custody. This argument is only relevant to the trial court's termination of her rights based on subsections (1)(N) and (1)(O) of section 161.001. *See id.* § 161.001(1)(N), (O).

Because "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest," *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), the unchallenged findings that Lucy committed acts prohibited by section 161.001(1)(D) and (E) are sufficient to support the judgment. *See Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 434 (Tex. App.–El Paso 2004, no pet.); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.–Houston [1st Dist.] 2003, no pet.). Accordingly, we overrule Lucy's second, third, fourth, and fifth issues, and we need only address the best interest findings. *See In re*

*L.M.*, 104 S.W.3d at 647; TEX. R. APP. P. 47.1.

### III. BEST INTEREST

By her first issue, Lucy argues that the evidence supporting the trial court's best interest finding is factually insufficient to support the judgment. In a termination case, due process requires the Department to prove, by clear and convincing evidence, that termination is in the child's best interest. *See In re B.L.D. & B.R.D.*, 113 S.W.3d 340, 353-54 (Tex. 2003); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). The "clear and convincing" standard of proof requires "that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

In *In re C.H.*, the Texas Supreme Court held that the "clear and convincing" burden of proof affects the manner in which a court of appeals reviews the evidence for factual sufficiency. 89 S.W.3d at 25. The court explained:

> Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. But that standard is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing. As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.

*Id.* (citations omitted). Because the best interest finding must be based on clear and convincing evidence, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* We must be mindful to respect the role of the factfinder when reviewing termination

17

orders. *Id.* Although parental rights are of constitutional dimension, "they are not absolute." *Id.* at 26.

When determining whether termination is in a child's best interest, courts consider several factors, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[23]

The supreme court has explained that the *Holley* factors are not exhaustive and that not all the factors must be proved before termination is proper. *See In re C.H.*, 89 S.W.3d at 27. "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* However, the court recognized that in cases with complex facts, "paltry evidence relevant to each consideration mentioned in

---

[23] Courts have traditionally relied on the *Holley* factors to guide this analysis. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Additionally, Texas Family Code section 263.307 provides an extensive list of factors that may be considered in determining the child's best interest. *See* TEX. FAM. CODE ANN. § 263.307 (Vernon 2008). Except to the extent that the factors listed in this section overlap with the *Holley* factors, Lucy does not rely on this statute as a basis for reversing the judgment. Accordingly, we will review her arguments under the *Holley* factors.

*Holley* would not suffice to uphold the jury's finding that termination is required." *Id.*

Lucy first argues that the best interest finding must have a firm basis in facts separate and apart from the parent's wrongful conduct. Specifically, Lucy argues that even if the evidence supports a finding that a parent's conduct violated section 161.001(a) of the family code, a best interest finding should be reversed on appeal if the evidence shows that the abusive or neglectful parent has changed in a material way. Essentially, Lucy asks this Court to ignore the evidence of her wrongful conduct that led to the removal of her children and the wrongful conduct she continued after their removal, and she urges the Court to consider only the progress she made after the removal. We disagree that the analysis is as simple as Lucy suggests.

The supreme court has held that "[w]hile it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues." *Id.* Lucy relies on *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.–Fort Worth 2003, no pet.), to argue that the statutory grounds for removal and termination should not be considered. *In re W.C.*, however, does not stand for the proposition that courts can never consider the parent's wrongful behavior when determining the best interest of the children:

> A fact finder is not required to consider all of the listed factors and may reasonably form a strong belief or conviction regarding the interest of the child in the absence of evidence about some of these factors, particularly if the evidence were undisputed that the parental relationship endangered the child's safety. *Quite often, the best interest of the child is infused with the statutory offensive behavior. While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior.*

19

*W.C.*, 98 S.W.3d at 758 (citations omitted) (emphasis added).

In fact, the *Holley* factors expressly suggest consideration of: (1) the emotional and physical danger to the child now and in the future, and (2) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one. *See Holley*, 544 S.W.2d at 371-72. We hold that, particularly when the evidence shows that the parental relationship endangered the child's physical or emotional well-being, evidence of the parental misconduct leading to the removal and subsequent termination should be considered when reviewing the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding that the court of appeals should have considered father's "pattern of conduct that is inimical to the very idea of child-rearing," including his "extensive criminal history involving drugs and assaults" which continued unabated after C.H.'s birth).

Specifically, cases that involve endangering drug abuse are not the types of cases where the parent's wrongful conduct should be ignored. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 101-02 (Tex. App.–Houston [1st Dist.] 2006, no pet.); *In re L.M.*, 104 S.W.3d 642, 648 (Tex. App.–Houston [1st Dist.] 2002, no pet.). Evidence of a parent's unstable lifestyle can support the conclusion that termination is in the child's best interest. *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.–Fort Worth 2007, no pet.). In particular, a parent's drug use and failure to comply with a family service plan support a finding that termination is in the best interest of the child. *Id.*

Although Lucy argues that there is no evidence that her drug use endangered her children, we disagree. Lucy admitted to using drugs during her pregnancy with A.W., and A.W. was born with cocaine and marijuana in her system. Drug use during pregnancy

20

undoubtedly exposes a child to injury. *See In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.–San Antonio 2002, no pet.). Additionally, the evidence showed that Lucy was a habitual drug user and used drugs in front of C.C. and D.W., Jr. A prior investigation in 2005 revealed that Lucy was using drugs in the home on a daily basis, and that drugs were left on the table and on the floor—clearly within the children's reach. Leaving drugs within reach of a child certainly endangers the child. *Id.*

Nevertheless, even considering her past failures, Lucy argues that the evidence showed that she was complying with the Department's service plan and had demonstrated a clear departure from her past failures. Lucy argues that this Court should give deference to this evidence, given the important public policy favoring reunification of the family. *See Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re D.T.*, 34 S.W.3d 625, 641 (Tex. App.–Fort Worth 2000, pet. denied). While we agree that a presumption exists that reunification is in the child's best interest, we disagree that evidence of a turnaround will *always* offset other evidence favoring termination. *See In re J.W.M.,* 153 S.W.3d 541, 550 (Tex. App.–Amarillo 2004, no pet.) (noting rehabilitation was not "free from doubt")*; Smith v. Tex. Dep't of Protective & Regulatory Servs.,* 160 S.W.3d 673, 681 (Tex. App.–Austin 2003, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past.").

> The significance of a personal turnaround depends to some degree on what the turnaround is from. Termination may no longer be in the best interest of a child whose parent had a mental disorder that has been cured, or who made a single misjudgment. But such cases are hardly comparable to a parent struggling to escape . . . life-long addictions and abusive relationships . . . .

21

*In re M.G.D.*, 108 S.W.3d 508, 513 (Tex. App.–Houston [14th Dist.] 2003, pet. denied) (holding that a factfinder is "not required to ignore a long history of dependency and abusive behavior merely because it abates as trial approaches").

More importantly, however, the record does not support Lucy's characterization of her alleged "turnaround," which was by no means complete. Even though the service plan required Lucy to stop using drugs, and Lucy was aware that her drug use could result in the termination of her parental rights, she continued to fail drug tests during the time the children were in the Department's custody. Lucy's final hearing was scheduled for July 18, yet she failed a drug test on May 29. She admitted that she had last smoked marijuana on July 4, 2007, only two weeks before the trial date. *In re S.K.A.*, 236 S.W.3d 875, 901 (Tex. App.–Texarkana 2007, pet. denied) ("Continued narcotic use after the children's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct."); *J.W.M.*, 153 S.W.3d at 549 (noting that a mother's rehabilitation was not free from doubt where, shortly before trial, drug test indicated methamphetamine use).

At trial, Lucy did not deny that she continued to use drugs but claimed that she had "slacked down." Furthermore, Lucy never attended an outpatient drug treatment program even though the service plan required her to comply with any recommendations made pursuant to the drug assessment. While we agree that the evidence showed that Lucy was attending therapy and had complied with several aspects of the service plan, the undisputed evidence showed that she had failed to alleviate the main concern underlying the children's removal from the home—her persistent drug use. *See M.R.*, 243 S.W.3d at

22

821; *L.M.*, 104 S.W.3d at 648.

Lucy next argues that there was no testimony of several of the *Holley* factors, including that there was no evidence demonstrating the emotional and physical needs of the children now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, or the stability of the home or the proposed placement. Lucy points to evidence that (1) D.W., Jr., was likely not adoptable, and C.C.'s foster mother had asked for C.C. to be moved; (2) C.C. was disappointed when he could not visit with her, and D.W., Jr.'s emotional problems were likely the result of his removal from Lucy's home; (3) C.C. expressed his desire to return home with her; and (4) the children never suffered any ill effects when Lucy visited the children after she failed a drug test. We disagree that these arguments, individually or when considered together, require a finding that the evidence is factually insufficient to support the best interest finding.

First, the testimony indicated that D.W., Jr., would have problems being adopted because he suffered from several behavioral disorders. Additionally, at one time, C.C.'s foster mother requested that he be moved to another home when he acted out after one of Lucy's missed visitations. This testimony does not undermine the best interest finding. As the supreme court explained:

> [T]he Family Code provides that a court may appoint the Department as a child's managing conservator upon termination. Evidence about placement plans and adoption are, of course, relevant to best interest. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the

23

> child's best interest—even if the agency is unable to identify with precision the child's future home environment.

*In re C.H.,* 89 S.W.3d at 28. Thus, we conclude this evidence does not offset the significant evidence of Lucy's inability to maintain a drug-free lifestyle.

Second, Lucy argues that the evidence required a finding that the children's emotional well being would be better served if they returned home. Specifically, she claims that D.W., Jr.'s emotional problems were likely the result of his removal from Lucy's home and that C.C. was disappointed when he could not visit with her. We disagree. The evidence presented at trial did not indicate when D.W., Jr., began to suffer from his emotional problems. Lucy argues that because there was no evidence that D.W., Jr., suffered these emotional problems before the removal, we must infer that the problems were the result of the removal. Lucy has not cited any authority for requiring this inference from the evidence or supporting the proposition that such an inference would be strong enough to undermine the best interest finding. *See* TEX. R. APP. P. 38.1(i). Regardless of when the emotional problems surfaced, Lucy did not demonstrate any present ability to provide D.W., Jr., with the treatment that he needs for these problems, which undermines her arguments.

Moreover, C.C.'s disappointment when Lucy failed to visit is not a factor that undermines the best interest finding—rather, it supports the best interest finding. Lucy was unable to visit because she failed to comply with the trial court's order that she pass a drug test before each visit. Lucy chose to continue using drugs, and her choices—not the trial court's order—caused emotional harm to C.C.

24

Furthermore, the fact that the children did not exhibit any specific adverse reactions to seeing Lucy on the occasions where she had failed a drug test immediately prior to the visit, but instead enjoyed the visits and wanted to return home with her, does not undermine the best interest finding. Evidence of C.C.'s desire to return home likewise does not undermine the best interest finding. "[W]hat the children want . . . is not always in their best interests." *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 356 (Tex. App.–Austin 2000, no pet.). Even though the children may love their mother and want to be with her, reunification is not necessarily in their best interest. *Id.* We conclude that the evidence was factually sufficient to support the best interest finding in this case. We overrule Lucy's first issue.

## IV. CONCLUSION

Having overruled all of Lucy's issues, we affirm the trial court's judgment terminating Lucy's parental rights to C.C., D.W., Jr., and A.W.

_____
GINA M. BENAVIDES,
Justice

Memorandum Opinion delivered and
filed this the 2nd day of April, 2009.

25